### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| PETER DITTMER, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 10-182 |
| | § | |
| TEXAS SOUTHERN UNIVERSITY *et al.*, | § | |
| | § | |
| *Defendant*s. | § | |

### MEMORANDUM OPINION AND ORDER

Pending before the court is a motion for summary judgment filed by defendants Texas Southern University ("TSU"), John M. Rudley in his Individual Capacity ("Rudley"), and Charles M. Glass in his Individual Capacity ("Glass") (collectively, "Defendants"). Dkt. 17. Also pending before the court are plaintiff Peter Dittmer's ("Dittmer") objections to and motion to strike evidence contained within Defendants' motion for summary judgment. Dkt. 20. After reviewing the motions, responses, replies, other relevant filings by the parties, and the applicable law, the court is of the opinion that Dittmer's motion to strike (Dkt. 20) should be DENIED, and Defendants' motion for summary judgment (Dkt. 17) should be GRANTED.

### I. BACKGROUND

Dittmer claims that Defendants discriminated against him because of his race, color, and national origin. Dkt. 8. Dittmer, a Caucasian male, was a professor in the Airway Science Department of TSU.[1] He was also co-coordinator of the Airway Science Department, and as co-

---

[1] "The Airway Science Department offers academic degrees in Aviation Science Management, which focuses on several areas of the airline and aviation industry, including air traffic control, airport management, and aviation operations." Dkt. 8.

coordinator he had responsibility for the undergraduate component of the department's curriculum. *Id.* He also had authority to award scholarships to reward students with strong performance and to attract students to the department. *Id.* Dittmer claims that TSU did not offer any formal training regarding the procedures involved in recommending and approving scholarships. *Id.* Instead, he learned via on-the-job training, trial and error, and ad-hoc informal training by other members of the department and the College of Science and Technology. *Id.*

Dittmer claims that he "learned of a certain scholarship device" that "combined a variation of the university's undergraduate tuition rebate" with "a waiver of out-of-state or foreign tuition for students who were non-Texas residents." *Id.* The undergraduate tuition rebate is a rebate of tuition already paid by the student that is given to the student after successful completion of an undergraduate degree. *Id.* The "scholarship device" that combines the tuition rebate and out-of-state waivers operates as follows: a student who is selected to receive assistance pays $1,000 into a TSU scholarship fund, and the College of Science and Technology grants a tuition rebate to that student in the maximum amount of $1,000. *Id.* This "scholarship device," which the court will refer to as the "tuition-rebate practice," enabled nonresident and foreign students to qualify for residential tuition, which saved the students a substantial amount of money. Dkt. 17 & Exh. 1 at 55-56 (Dittmer Deposition). Dittmer claims that it was a "common and prevalent practice throughout TSU . . . for professors to award $1,000 scholarships to foreign students in order that they could be considered for a tuition waiver." Dkt. 21. Specifically, Dittmer claims that the chairperson of the College of Science and Technology, Dr. Yu, who is of Chinese descent, engaged in this practice. Dkt. 21 & Exh. 1.

In early 2007, at least one and possibly two international students complained about Dittmer's tuition-rebate practice.  *See, e.g.*, Dkt. 17; Dkt. 17, Exh. 3; Dkt. 21, Exh. 1H (noting that the "matter was only brought to light by a student complaint"); Dkt. 21, Exh. 1I (indicating that a criminal investigation was started due to allegations of fraud contained within student complaints); Dkt. 22, Exh. 2A (indicating that students had complained).[2]  The student or students alleged that they paid money to Dittmer in exchange for scholarships, expecting to receive a scholarship or tuition waiver equal to the amount paid, and that the total scholarships or waivers received were less than the student(s) paid.  Dkt. 17, Exhs. 2, 2B, 2E, 3; Dkt. 22, Exh. 2A.[3]  In February 2007, the head of the Airway Science Department advised Dittmer in writing to stop the tuition-rebate practice.  Dkt. 17, Exh. 2K; Dkt. 22.  Dittmer claims that he discontinued the practice after receiving this letter.  Dkt. 21, Exh. 1.

In January 2008, Rudley became the President of TSU.  Dkt. 21, Exh. 1.  When Rudley was the Interim President of the University of Houston prior to his tenure with TSU, Dittmer filed a claim against the University of Houston and several of its faculty members relating to issues he had finalizing his Ed.D. degree.[4]  Dkt. 21, Exh. 1.  According to Dittmer, "allegations regarding the

---

[2] Dittmer has moved to strike the student reports and statements in affidavits supporting Defendants' contention that students complained.  *See* Dkt. 20.  As discussed in Part III.A, *supra*, the court finds that these statements are used for a non-hearsay purpose—to show that complaints were made, not that the complaints were true—but the court offers multiple citations to demonstrate that the evidentiary record is replete with references to these complaints.

[3] The court draws no conclusions regarding the validity of the student complaints.  The documents recounting the complaints are used as evidence that the complaints were received, not for the truth of the matter contained within the hearsay statements.

[4] Dittmer claims that Rudley was the interim president of University of Houston while his lawsuit against University of Houston was pending, yet he also claims that he filed the University of Houston lawsuit in May 2008 and that Rudley became the president of TSU in January 2008.  Dkt. 21, Exh. A.  The court presumes that there is either a typo in the date of filing of the University of Houston

informal tuition rebate practice began to resurface" almost "immediately after [Rudley] assumed that position." *Id.*

Specifically, Dittmer claims that the TSU Office of General Counsel instructed the Office of Internal Audit to begin investigating allegations of alleged misappropriation of Airway Science Department scholarship funds in April 2008 .[5] *Id.* In September 2008, the Office of Internal Audit submitted a report of its findings to Rudley and several other administrative officials. Dkt. 17, Exhs. 2I, 2J. The Office of Internal Audit found that there was "adequate evidence to support the allegations that a professor (Dittmer) in the Airway Science Department collected monies from students in exchange for scholarships and waivers of out-of-state / or [sic.] foreign tuition."[6] Dkt. 17, Exh. 2I; Dkt. 21, Exh. 1A.

Meanwhile, in August 2008, the TSU Department of Public Safety Criminal Investigation Division ("TSU DPS CID") initiated a fraud investigation of Dittmer relating to his alleged solicitation of funds from TSU students in exchange for scholarships. Dkt. 17, Exh. 3E. In early September 2008, the TSU DPS CID forwarded the case to the Harris County District Attorney's Office for further investigation. Dkt. 21, Exh. 1J. On November 3, 2008, the investigator for the Harris County District Attorney's Office informed the TSU DPS CID that he had found no violation

---

lawsuit or that Dittmer was actively involved in negotiating with University of Houston prior to actually filing a lawsuit. *Id.*

[5] The audit report indicates that the Office of General Counsel provided information to the Office of Internal Audit on April 13, 2007, not 2008. Dkt. 21, Exh. 1A.

[6] After this audit, TSU changed its policy regarding recommendations and awards of student waivers. While previously department heads could make such recommendations, now only the Deans can make the recommendations, and they must be in writing and contain the criteria for the scholarship received. Dkt. 21, Exh. 1A at 3.

of criminal laws.  Dkt. 21, Exh. 1J.  The investigator determined that some students were given more money than others, but there was no evidence that Dittmer had kept any money for himself.  *Id.*

On December 19, 2008, the Provost and Vice President of Academic Affairs Sunny E. Ohia, who had received a copy of the report from the Office of Internal Audit, sent Dittmer a letter advising him that his employment was terminated in accordance with section 7.1 of the TSU Faculty Manual due to the outcome of the completed investigations of the Office of Internal Audit and the TSU police department.  Dkt. 21, Exh. 1D.  On January 5, 2009, Dittmer sent a letter to the chairperson of the Faculty Assembly/Senate Office.  Dkt. 21, Exh. 1G.  In this letter, Dittmer advised the chairperson that TSU had terminated his employment in December and that he would "like to exercise [his] right as a faculty member to a hearing for the alleged offenses and any improprieties in the termination process."  *Id.*

The Faculty Hearing Committee ("Committee") met to hear Dittmer's appeal of his termination on April 24, 2009.  Dkt. 21, Exh. 1G.  The Committee determined that Dittmer "did process funds through the Airway Science program scholarship fund in the manner described," but he "did not profit personally from this activity."  *Id.*  It noted that it had some unresolved concerns due to not receiving information that it requested, but that, given "the ambiguities in the activities," it felt "that Dr. Dittmer's termination was too severe a penalty for violation of University policy that was not explicitly monitored by management."  *Id.*  The Committee noted that it appeared that Dittmer was only "interested in helping students to get the tuition fee waiver by having them 'contribute' to a scholarship fund to receive the funds back with a waiver," and that while this was "possibly a subversion of university policy and possibly grounds for termination had [Dittmer] been monitored and formally warned to stop by management," the "matter was only brought to light by

5

a student complaint, which precipitated the formal investigation, even though the practice was well known." *Id.* The Committee ultimately recommended that Dittmer be reinstated, as "the punishment was too severe." *Id.*

Notwithstanding the Committee's recommendation, on May 19, 2009, Rudley sent Dittmer a letter informing him that his termination was "effective immediately." Dkt. 21, Exh. 1E. Rudley informed Dittmer that he was in receipt of the Committee's recommendation and, while he accepted its finding regarding Dittmer's violation of TSU policy with regard to the tuition-rebate practice, he rejected the recommendation to reinstate Dittmer's employment. *Id.*

Dittmer filed his complaint against TSU, Rudley, individually and in his official capacity, and Glass, individually and in his official capacity, on January 20, 2010. Dkt. 1. Dittmer's original complaint contained numerous claims, including claims for violations of Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983, the Texas Labor Code, as well as various state tort claims. Dkt. 1. On March 22, 2010, TSU moved to dismiss the complaint. Dkt. 6. On April 10, 2010, Dittmer filed his first amended complaint, in which he added a claim that TSU violated the Texas Education Code by failing to provide him with written notification that it was not going to provide a written contract for the 2008/2009 academic year and clarified that he was asserting claims under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983 against all defendants. Dkt. 8. On August 5, 2010, the court issued an order in which it granted the Defendants' motion to dismiss the § 1983 claims against TSU, Rudley, and Glass in their official capacities, the § 1981 claims, the Texas Education Code claims, the Texas Labor Code claims, and the state tort claims. Dkt. 12. The Title VII claims against TSU and the § 1983 claims against Rudley and Glass in their individual capacities remain. *Id.* Defendants now move for summary judgment in their favor on these remaining claims. Dkt. 17.

Defendants argue that the evidence establishes that Dittmer cannot satisfy his *prima facie* burden of discrimination and that, even if he could, the evidence shows that Dittmer was dismissed for legitimate, non-discriminatory reasons.  Dkt. 17.  Defendants also argue that Dittmer has no evidence that Rudley or Glass violated his due process rights and, regardless, are entitled to qualified immunity.  *Id.*  Dittmer, on the other hand, claims that there are genuine issues of material fact with regard to each of his surviving claims that must be presented to a jury for resolution.  Dkt. 21. Specifically, Dittmer claims that genuine issues of material fact remain regarding whether he had a valid property interest in continued employment at TSU, whether he has established a *prima facie* case of discrimination, and whether Defendants' alleged reasons for his termination are pretextual and the real reason for his termination was discriminatory.  *Id.*  Dittmer also presents several objections to the summary judgment evidence offered by Defendants.  Dkt. 20.

## II. Legal Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Carrizales v. State Farm Lloyds*, 518 F.3d 343, 345 (5th Cir. 2008).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; there must be an absence of any genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S. Ct. 2505 (1986).  An issue is "material" if its resolution could affect the outcome of the action.  *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007).  "[A]nd a fact is genuinely in dispute only if

a reasonable jury could return a verdict for the non-moving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006).

The moving party bears the initial burden of informing the court of all evidence demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Only when the moving party has discharged this initial burden does the burden shift to the non-moving party to demonstrate that there is a genuine issue of material fact. *Id.* at 322. If the moving party fails to meet this burden, then it is not entitled to a summary judgment, and no defense to the motion is required. *Id*. "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995); *see also Celotex*, 477 U.S. at 323–25. To prevent summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting Fed. R. Civ. P. 56(e)).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envl. Conservation Org. v. City of Dallas, Tex.*, 529 F.3d 519, 524 (5th Cir. 2008). The court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence; disregard all evidence favorable to the moving party that the jury is not required to believe; and give credence to the evidence favoring the non-moving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached. *Moore v. Willis Ind. Sch.*

*Dist.*, 233 F.3d 871, 874 (5th Cir. 2000).  However, the non-movant cannot avoid summary judgment simply by presenting "conclusory allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  By the same token, the moving party will not meet its burden of proof based on conclusory "bald assertions of ultimate facts."  *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978); *see also Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1221 (5th Cir. 1985).

### III. ANALYSIS

**A.  Evidentiary Issues**

Defendants present their summary judgment evidence in the form of affidavits from Keith Beckford and Sunny Ohia.  Dittmer moves to strike these affidavits, claiming that they contain impermissible hearsay and statements of legal and factual conclusion not supported by the affiants' personal knowledge.  Dkt. 20.

**1.      Beckford Affidavit**

Beckford's affidavit indicates that he is the fraud manager in TSU's Department of Internal Audit.  Dkt. 21, Exh. 2.  He states that his duties include investigating allegations of fraud, auditing TSU departments, and presenting fraud prevention and awareness training.  *Id.*  He claims he conducted an investigation into allegations that professors in the Airway Science program had collected money from students in exchange for scholarships and recommendations for out-of-state or foreign tuition waivers.  *Id.*  Beckford indicates that, after interviewing various university administrators and personnel and reviewing information contained in TSU's accounting and enrollment management systems, he concluded that "the evidence supported the students'

9

allegations" relating to Dittmer. *Id.* Beckford attached several documents to his affidavit that were kept in his investigative file, which he states were "kept in the regular course of business," and he notes that it was the regular course of business for him, as an investigator, to receive the records at or near the time they were created. *Id.* These documents include a memorandum from TSU's associate provost to TSU's general counsel regarding the alleged misappropriation of funds (2A),[7] statements from three TSU students or former students (2B, 2E, 2H), a bank record of one of these students (2C), a cancelled check from one of the students (2F), the TSU account summary for two of the students (2D, 2G), a memorandum from Beckford to Rudley regarding the outcome of the audit (2I), a memorandum from Beckford to Ohia and others regarding the outcome of the audit (2J), and a letter to Dittmer from Yu advising Dittmer to stop the tuition rebate practice (2K). Dkt. 17, Exh. 2 & attachments; Dkt. 22, Exh. 2A.

   **a. Hearsay**.

   Dittmer argues that Beckford's statement that students complained and the students complaints (Dkt. 17, Exhs. 2B, 2E, and 2H), the memorandum to TSU's general counsel (Dkt. 22, Exh. 2A), and the bank records of the students (Dkt. 17, Exhs. 2C, 2F), are all inadmissible hearsay or double hearsay. Defendants claim that the records fall within the business records exception and that, even if they are not business records, both the records and the statement about student complaints are offered to demonstrate why Beckford initiated the investigation of Dittmer, not for the truth of the matter asserted.

---

[7] Defendants did not attach Exhibit 2A to Beckford's affidavit in their motion for summary judgment. They indicated in their reply brief that the omission of the document was a mistake, and they attached it to their reply brief. *See* Dkt. 22 & Exh. 2A.

Under the business records exception,

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of regularly conducted business activity, and it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness [is not excluded by the hearsay rule].

Fed. R. Evid. 803(6).  Dittmer argues that Beckford merely *received* the records and cannot attest to whether they were "*made* at or near the time," and he does not state that it was the regular practice of that business to *make* the documents.  Dkt. 20.  Beckford specifically states the following: "These records are kept in the regular course of business, and it was the regular course of business for me, as the investigator with knowledge of the act, event or condition recorded to receive such records at or near the time these were made or reasonably soon thereafter."  Dkt. 17, Exh. 2.  The court agrees that Beckford has not sworn that the documents were *made* in the ordinary course of business, and the court is not inclined to make such an inference.  Therefore, the documents do not fall within the "records of a regularly conducted activity" hearsay exception.

However, Defendants also argue that the documents, as well as Beckford's statement that student complaints were received, are offered for a non-hearsay purpose, to show, essentially, that such complaints were made.[8]  The court agrees that, to the extent the documents are offered to show

---

[8]  Dittmer argues that Defendants' allegation is that Dittmer was terminated because of "what the investigation concluded, which was based entirely on the allegations set forth in the referenced exhibits," so they are obviously being offered for the truth of what they assert.  Dkt. 24.  However, if Dittmer's termination was based solely on what the investigation concluded, then there are no evidentiary issues with which to grapple, as Dittmer himself relies on the report from the Office of Internal Audit, which he attached to his response to the motion for summary judgment.  *See* Dkt. 21, Exh. 1A.  The admissibility of the report is not contested.  Beckford was not required to comply with the Federal Rules of Evidence when conducting the investigation that led to the report, so whether he based his conclusions (which are admissible) on inadmissible evidence is irrelevant.  The documents are appropriately used to show why he reached the conclusion he reached.

that complaints were received by TSU, as opposed to being used to show that the statements contained within the documents are true, the documents are used for a non-hearsay purpose and are admissible. The court therefore does not rely on the documents for the truth of the matter asserted, but it does refer to the documents to show why TSU believed there were such complaints and commenced an investigation.

### b.    Conclusory Allegations.

Dittmer argues that Beckford's statement that the evidence supports the students' allegations should be stricken because it is conclusory and does not arise out of Beckford's personal knowledge, as there is no evidence that he even spoke to any students. Dkt. 20. Defendants claim that Beckford's conclusions are not "conclusory" because he is merely stating the conclusions of his investigation. Dkt. 23. Moreover, the conclusions stated in the affidavit are also contained within the internal audit memoranda (Dkts. 2I, 2J), to which Dittmer did not object. *Id.* The court agrees that Beckford is merely expressing his conclusions, which are also contained in the report. Accordingly, the statement is admissible.

### c.    Authentication.

Dittmer also argues that the records attached to Beckford's affidavit are not authenticated in any way, as there is no way to know if they were actually created by the persons whom Defendants claim created them. Dkt. 20. Defendants claim that the documents are self-authenticated under Federal Rule of Evidence 902(11) because they are accompanied "by a written declaration of [the] custodian or other qualified person," Beckford, who certified that the documents meet the requirements of Rule 803(6). *Id.* As noted above, the court does not agree that Beckford's affidavit satisfies the requirements of Rule 803(6), so the documents are not self-authenticated under this reasoning.

However, the court finds that the documents are sufficiently authenticated for the purpose for which they are offered. Federal Rule of Evidence 901 states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901. There is no requirement of "conclusive proof of authenticity before allowing the admission of disputed evidence," there must simply be "some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be." *United States v. Jimenez Lopez*, 873 F.2d 769, 772 (5th Cir. 1989). Beckford claims that he received the documents in the ordinary course of business and that he kept them in his file in the ordinary course of business. Dkt. 17, Exh. 2. While he cannot attest to the authenticity of the complaints himself, he can attest to the fact that he received the complaints and kept them in his file. This is sufficient evidence "to support a finding that the matter in question is what its proponent claims"—a reason to commence an investigation into the scholarship practices of the Airway Science Department.

Therefore, Dittmer's motion to strike Beckford's affidavit and the exhibits thereto is DENIED. However, the court only considers hearsay contained within the affidavit or exhibits to the extent it is offered for non-hearsay purposes.

### 2.    Ohia Affidavit

Ohia is the provost and vice president of academic affairs and research at TSU.[9] Dkt. 17, Exh. 3  In his affidavit Ohia states that he received the report from the Office of Internal Audit regarding the investigation of the Airway Science Department scholarship practices in the fall of

---

[9] Part of Ohia's job entails approving or recommending to the president of the university "actions pertaining to appointments, reappointments, tenure, promotion, termination, and dismissal of faculty members." Dkt. 17, Exh. 3. He also "receive[s] recommendations regarding faculty grievances and student academic grievances." *Id.*

2008. *Id.* He indicates that he was already aware that two international students had complained about Dittmer encouraging them to donate money to fund their own scholarships but then did not receive the full amount back, and he states that it is his understanding that this practice is illegal. *Id.* Ohia notes that he met with Dittmer in December 2008 to discuss the findings of the Office of Internal Audit, and that Dittmer "did not deny that he engaged in these practices." *Id.* In addition, he claims that Dittmer admitted to allowing students to fund their own scholarships so that they could be eligible for in-state tuition and "admitted that he did not know what happened to the additional money the two international students paid." *Id.* Ohia states that he determined that termination was warranted after this meeting, and, after receiving approval from human resources, he signed the letter of termination that Dittmer received. *Id.* He further indicates that his decision was not based on discriminatory reasons but on the fact that he believed there was a "serious violation of state law, impropriety and misrepresentation regarding the waiver of out of state tuition." *Id.* Additionally, he claims that he is unaware of any other professors engaging in the tuition rebate practice, or about any complaints regarding similar practices by other faculty members. *Id.* Finally, he claims that Dittmer was the person who managed the scholarship fund and that his "management practices led to the appearance of impropriety within the Department of Transportation." *Id.*

Ohia attached five exhibits to his affidavit, which he states are documents that he keeps as part of his file in the provost's office, in the regular course of business. *Id.* The documents are (1) his request to human resources for Dittmer's dismissal (3A); (2) the letter of termination he sent to Dittmer (3B); (3) the findings of the Faculty Hearing Committee (3C); (4) Rudley's letter to Dittmer regarding the Faculty Hearing Committee's findings (3D); and (5) a report from Detective Howard Sylve III regarding the TSU DPS CID investigation (3E). Dkt. 17, Exh. 3 & attachments.

Dittmer moves to strike Ohia's affidavit because he claims that it contains conclusory statements that are not supported by Ohia's personal knowledge, and he moves to strike exhibit 3E to the affidavit because it does not comply with the redaction requirements for filing the exhibit. Dkt. 20.  The court finds no validity to Dittmer's objections to the substance of Ohia's affidavit. Dittmer cites Federal Rule of Civil Procedure 56(c)(4) to support his argument that the affidavit is not based on personal knowledge. Federal Rule of Civil Procedure 56(c)(4) states: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Dittmer notes that simply stating that the matters are within the affiant's personal knowledge is not sufficient.  Dkt. 20 (citing Fed. R Evid. 602; *Amie v. El Paso Indep. Sch. Dist.*, 253 Fed. App'x 447, 451 (5th Cir. 2007)).  Ohia, however, does not merely state that the affidavit is made on personal knowledge.  He outlines his qualifications and job responsibilities, which include dealing with the matters discussed in the affidavit, indicates the level of his personal involvement in the matters asserted, and provides his personal opinions that led to his decision to terminate Dittmer's employment.  Dkt. 17, Exh. 3.  These statement provide ample support for Ohia's statement that the matters set forth in the affidavit are made on personal knowledge.

Dittmer claims that Ohia's affidavit is conclusory because it contains conclusions about the legality of Dittmer's tuition-rebate practice, and Ohia is not an expert on legal matters.  Dkts. 20, 24. Dittmer cites Federal Rule of Evidence 701 to support this contention.  Federal Rule of Evidence 701 limits the testimony of lay witnesses "to those opinions or inferences which are (a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  Ohia's testimony falls within these

15

limits.  Ohia did not testify that the practice *is* illegal, he stated that it is his *understanding* that the practice is illegal.  Ohia is clearly offering his opinion to show his state of mind when he decided to terminate Dittmer's employment, and the reason for termination is highly relevant in this case—as Dittmer claims he was terminated for discriminatory reasons.

Dittmer argues that Ohia's state of mind is not at issue, as he was not the final decisionmaker.  Dkt. 24.  He notes that Ohia specifically states that he submitted the request to terminate Dittmer's employment and received approval.  Dkt. 24.  The court finds, however, that Ohia's state of mind *is* at issue.  He clearly played a major role in the decision to terminate Dittmer's employment, initially, by making the recommendation to human resources and sending Dittmer a termination letter under his signature.  Dkt. Exhs. 3 & 3A.  The reasons for making this decision are highly relevant, and the statements in Ohia's affidavit explaining the opinions that led him to reach the decision are admissible to show his state of mind.[10]

With regard to Dittmer's claim that exhibit 3D to document 17 should be stricken, the court agrees that this exhibit contains private information that should have been redacted.  The court hereby GRANTS Dittmer's request to strike exhibit 3E to Ohia's affidavit.  Exhibit 3E, which is attached to document number 17, is hereby STRICKEN.  Defendants filed an appropriately redacted version, which they attached to their reply to Dittmer's response to their motion for summary judgment.  *See* Dkt. 22, Exh. 3E.  The court accepts the redacted version.  Exhibit 3E to document 22 shall be substituted for exhibit 3E to document 17.

_____

[10]  Dittmer also complains that Ohia's statement that Dittmer managed the scholarship fund and his management practices led to an appearance of impropriety is false, conclusory, and not within Ohia's personal knowledge.  Dkt. 20.  The court did not rely on this statement in reaching its conclusions, so it does not address the merits of this contention.

In sum, the court finds that Dittmer's evidentiary objections to the substance of Ohia's affidavit are unfounded, but his objections to exhibit 3E are sustained.  Accordingly, Dittmer's motion to strike Ohia's affidavit is GRANTED IN PART AND DENIED IN PART.  It is GRANTED only to the extent it seeks to strike exhibit 3E to document 17, as noted above.  It is DENIED in all other respects.

## B.    Discrimination

Dittmer claims that Rudley and Glass, in their individual capacities, violated 42 U.S.C. § 1983 by depriving him of his right to equal protection under the law as set forth in sections 1 through 5 of the Fourteenth Amendment.  Dkt. 8.  Dittmer also claims that TSU discriminated against him in violation of Title VII of the Civil Rights Act of 1964.[11]  Title VII makes it unlawful for an employer to discharge an employee because of his or her "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Section 1983 provides a legal remedy for persons who have been subjected to a deprivation of rights, privileges, or immunities secured by the Constitution of the United States by a person acting under the color of state law.  42 U.S.C. § 1983.  The summary judgment test for discrimination claims under § 1983 is the same as the test for discrimination claims under Title VII.  *Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 342 (5th Cir. 2002).

A plaintiff can prove intentional discrimination through either direct or circumstantial evidence.  *See Urbano v. Continental Airlines Inc.*, 138 F.3d 204, 206 (5th Cir. 1998).  Direct

---

[11] Dittmer originally asserted that the Defendants retaliated against him in violation of Title VII and §§ 1981 and 1983. Dkts. 1, 8.  In their motion for summary judgment, Defendants indicate that these claims were either abandoned by Dittmer or were dismissed by the court's August 5, 2010 order dismissing various claims.  Dkt. 21 n.2.  Dittmer neither disputes this contention nor presents any evidence that his retaliation claims have merit.  *See* Dkt. 21.  The court considers this absence of dispute as a concession that the August 5, 2010 order dismissed any remaining retaliation claims asserted by Dittmer.

evidence is evidence which, if believed, proves the fact without inference or presumption. *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 992 (5th Cir. 2005) (citing *Brown v. E. Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir.1993)).   When a plaintiff offers only circumstantial evidence, the *McDonnell Douglas* framework requires the plaintiff to establish a *prima facie* case of discrimination, which, if established, raises a presumption of discrimination.  *See Rutherford v. Harris County, Tex.*, 197 F.3d 173, 179-80 (5th Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S. Ct. 1817 (1973)).  To establish a *prima facie* case, the plaintiff must show that "(1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) others similarly situated were more favorably treated" or the plaintiff was replaced by a non-minority.  *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir. 2006) (quoting *Rutherford*, 197 F.3d at 184); *Jatoi v. Hurst-Eules-Bedford Hosp. Auth.*, 807 F.2d 1214, 1219 (5th Cir. 1987).  The Fifth Circuit has held that only "ultimate employment decisions," such as hiring, granting leave, discharging, promoting, and compensating, satisfy the "adverse employment action" element of a *prima facie* case of discrimination. *See Hunt v. Rapides Healthcare Sys., LLC* , 277 F.3d 757, 769 (5th Cir. 2001).  The plaintiff must raise a genuine issue of material fact as to all four elements of his or her *prima facie* case of discrimination. *Id.*

If the plaintiff successfully establishes a *prima facie* case of discrimination, the employer must then produce a legitimate nondiscriminatory reason for its adverse employment decision.  *Id.* Once the employer produces a legitimate nondiscriminatory reason, the presumption of discrimination dissipates and the burden shifts back to the plaintiff-employee to raise a genuine issue of material fact that the nondiscriminatory reason is merely pretextual in order to survive summary judgment.  *Id.*  To carry this burden, the plaintiff must produce substantial evidence indicating that

18

the proffered legitimate nondiscriminatory reason is a pretext for discrimination. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).  A plaintiff may establish pretext by showing either (1) the reason offered by the employer is untrue, or (2) the reason is true, but the plaintiff's protected characteristic was a motivating factor in the adverse decision (the "mixed-motives" alternative). *Id.*; *Keelan v. Majestco Software, Inc.*, 407 F.3d 332, 341 (5th Cir. 2005).  If "'the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted evidence that no discrimination had occurred,' the employer may be entitled to judgment in its favor." *Price v. Fed. Express Corp.*, 283 F.3d 715, 724 (5th Cir. 2002) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097 (2000)).  "Whether summary judgment is appropriate depends on numerous factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.'" *Id.* at 720 (quoting *Reeves*, 530 U.S. at 148-49).  The plaintiff bears the ultimate burden of persuading the trier of fact, by a preponderance of the evidence, that the employer intentionally discriminated against him or her because of his or her protected status. *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219–20 (5th Cir. 2001).

TSU does not contest that Dittmer is a member of a protected class or that he was qualified for his position.  TSU argues, however, that the only adverse employment action is the termination of Dittmer's employment and that Dittmer cannot show that similarly situated professors who were not in Dittmer's protected class were treated more favorably.  Dkt. 17.  Dittmer claims that non-white TSU professors allegedly engaged in the same tuition-rebate conduct as he and were not disciplined, investigated, or terminated, and he argues that this raises an issue of material fact.  Dkt. 21. Specifically, Dittmer claims that Dr. Yu, who is of Chinese descent, engaged in the same tuition-

rebate practice as he and was not disciplined, investigated, or terminated as a result. *Id.* Dittmer also lists the names of several other TSU faculty members who allegedly engaged in the same tuition-rebate practice, but Dittmer does not identify the race, color, or national origin of any of these other faculty members. *See* Dkt. 21, Exh. 1 at 4, Exh. 2 at 84-85.

### 1.    Investigation

The court first addresses Dittmer's claim regarding other non-white professors who engaged in the same tuition-rebate practices as Dittmer yet were not disciplined or investigated. Dittmer argues that the investigation was "a directed witch hunt to drum up any possible reason to implicate [Dittmer] in wrongdoing." Dkt. 21 at 18 (citing Exh. 1I). TSU argues that an investigation is not an "ultimate employment decision." Dkt. 17. The court agrees that the investigation, in and of itself, was not an ultimate employment action. However, even if it were, Dittmer has not shown that similarly situated non-white professors were treated differently. In a report from Detective Howard Sylve III of the TSU Department of Public Safety, Sylve states that he reviewed documents submitted by various complainants and witnesses before commencing the investigation and determined, in his professional opinion, that Dittmer had committed fraud. Dkt. 17, Exh. 3E. Thus, there is evidence that Sylve instigated the investigation due to student complaints about Dittmer's tuition-rebate practices. Dittmer does not present any evidence that there were complaints against non-white professors. Instead, he notes that the Faculty Hearing Committee found that the tuition-rebate practice was a "well known" practice at TSU. Dkt. 21 & Exh. 1. The student complaints that led to the investigation of Dittmer, however, were not simply about Dittmer engaging in the tuition-rebate practice—they were about Dittmer allegedly failing to award scholarships or waivers in an

amount equal to the amount of the donations submitted by the students.[12]  *See* Dkt. 17, Exhs. 2A, 2B, 2E, 3.  Dittmer has not shown that TSU received any complaints about the use of the tuition-rebate practice by non-white professors, and, even if these professors engaged in the practice and TSU knew about it, he has not shown that there were complaints about discrepancies between the amounts donated and received by students benefitting from the tuition-rebate practices of non-white professors.  Thus, he has not shown that *any* other TSU professor was similarly situated at the time of the investigation.

Dittmer claims that TSU's position that the other individuals were not the subject of formal student complaints impermissibly focuses attention on the actions of third parties and not those of Dittmer.  Dkt. 21.  Dittmer argues that the appropriate question is whether *Dittmer*'s conduct was similar to the conduct of other non-white TSU employees who were not disciplined, investigated, or terminated.  Dkt. 21 at 12.  Dittmer, however, does not cite any authority for this proposition, and there *is* authority for the opposite conclusion—that complaints by third parties *can* create a distinction between a plaintiff and other similarly situated individuals who engaged in the same practice.  For example, in *Morrow v. Wal-Mart Stores, Inc.*, Wal-Mart terminated the employment of two male employees after they allegedly violated Wal-Mart's sexual harassment policy.  152 F.3d 559, 560 (7th Cir. 1998).   The male employees sued Wal-Mart, claiming that Wal-Mart discriminated against them on the basis of sex because it terminated their employment for violating its sexual harassment policy, yet it did not terminate the employment of a female employee who had engaged in similar harassment practices.  152 F.3d at 560.  Wal-mart claimed that the male

---

[12]  The court is not relying on the student statements for the truth of the matter asserted, in that whether Dittmer actually provided scholarships and waivers in the amount of the donations is irrelevant.  What *is* relevant is that TSU *received* these complaints.  Thus, the evidence is considered for a non-hearsay purpose—to establish Defendants' state of mind.

employees could not meet the similarly situated prong of their *prima facie* burden because they and the alleged female harasser were not similarly situated—there was never a sexual harassment complaint against the alleged female harasser.  *See id.* at 562.  The district court held that the employees were not similarly situated because Wal-Mart had not received complaints of harassment relating to the female employee, and the Seventh Circuit affirmed.[13]  *Id.* at 563; *see also Yeager v. City Water & Light Plant of Jonesboro, Ark.*, 454 F.3d 932, 934 (8th Cir. 2006) (finding that the absence of contemporaneous complaints against the allegedly similarly situated individual and the admission of misconduct on the part of the plaintiff justified treating the allegedly similarly situated individual more leniently).[14]

The court makes no judgment regarding whether it is sound business practice to take action only when complaints are made.  The court is tasked with determining whether the distinction is sufficient to demonstrate that the individuals were not similarly situated, even if the distinction necessarily depends on the actions of third parties rather than the plaintiff, and the court finds that it is.  Moreover, as noted by the *Morrow* court, there is, at least inferentially, a difference between conduct of an employee that provokes a complaint and conduct that does not provoke a complaint.  *See Morrow*, 153 F.3d at 562.  Moreover, here, the inferences drawn by TSU that led it to investigate Dittmer's conduct and not that of other professors arose from more than just the fact that Dittmer's conduct provoked student complaints and the other professors' conduct did not.  The summary

---

[13]  The lower court couched its analysis in terms of pretext rather than determining that the plaintiffs had not met their *prima facie* burden.  152 F.3d at 561.  The Seventh Circuit, however, determined that the plaintiffs failed to meet their *prima facie* burden.  *Id.*

[14]  The court notes that Dittmer admitted to engaging in the practice, *see* Dkt. 21, Exhs. 1A, 1I, which also differentiates him from the other professors who allegedly engaged in the same tuition-rebate practice.  *Cf. Yeager*, 454 F.3d at 934.

judgment evidence demonstrates that, at the time TSU commenced the investigation, TSU had reason to believe not only that Dittmer engaged in the tuition-rebate practice but that there were discrepancies between the amounts donated and received by students donating funds through Dittmer. Dittmer has presented no evidence indicating that TSU had reason to believe that there were discrepancies with funds allegedly funneled through other professors. Thus, even if the investigation itself constitutes an adverse employment action, Dittmer has failed to show that TSU failed to investigate similarly situated individuals outside of his protected class.

### 2.    Termination

Both parties agree that the termination of Dittmer's employment was an ultimate employment decision, but they disagree regarding whether there were similarly situated non-white professors who were treated differently. Dittmer argues that he and the non-white professors who also allegedly engaged in the tuition-rebate practice were similarly situated because, by the time Rudley decided *not* to reinstate Dittmer's employment, which is the final termination decision, the Harris County District Attorney had determined that Dittmer was not guilty of a crime, the Faculty Hearing Committee had determined that Dittmer "did not enrich himself and was only interested in promoting the program," and the Faculty Hearing Committee had advised that the "practice was well known." Dkt. 21 & Exhs. 1H, 1J. TSU argues that Dittmer can present no evidence that non-white professors who were not terminated were subject to an investigation and audit whereby it was discovered that they could not account for discrepancies in the amount of money donated and the scholarships funded. Dkt. 17 at 14.

Dittmer is correct that at the time that Rudley made the final determination to uphold Dittmer's termination, there were many similarities between Dittmer and the other professors who allegedly engaged in the tuition-rebate practice. They were all professors who worked or had worked

at TSU, and presumably they, like Dittmer, did not enrich themselves by engaging in the tuition-rebate practice and were not being prosecuted by the Harris County District Attorney.  However, it is the differences and not the similarities that are key to the instant inquiry.  At the time of Rudley's final decision, the Faculty Hearing Committee report and results of the investigation reveal that students who had donated funds in exchange for scholarships or waivers to be awarded by Dittmer complained that they did not receive a scholarship or tuition waiver equal to the amount of money they donated.  Dkt. 21, Exh. 1I.  Additionally, the investigation revealed that a student who was questioned during the investigation also did not receive a scholarship or waiver equal to the amount she donated.  Dkt. 21, Exh. 1I.  Dittmer has presented no evidence of similar reports about other professors.  The burden lies with Dittmer, and he has failed to meet that burden.

Furthermore, even if Dittmer had met his *prima facie* burden, Defendants have presented sufficient evidence to demonstrate that TSU and Rudley had a legitimate, nondiscriminatory reason for terminating Dittmer's employment, and Dittmer has not shown that the reason is pretext.  TSU's Faculty Manual indicates that TSU can terminate a professor's employment for "good cause," and the Faculty Manual describes good cause as being "[s]erious professional or personal misconduct."[15] Dkt. 21, Exh. 1F.  Defendants claim that Dittmer's employment was terminated because of the complaints about discrepancies between the amount "donated" and the amount students claim to have received.  Defendants have presented evidence not only that TSU received the initial complaints about discrepancies between the amount donated and received, but also evidence in the form of a sworn affidavit that TSU student Fatoumata O. Diakite gave Dittmer check for $1200 in 2006 for

---

[15] Dittmer points out that his conduct does not fall within any of the delineated examples of "good cause" set forth in the manual.  However, the manual specifically states that "[s]erious professional or personal misconduct includes, *but is not limited to*," the delineated causes.  Dkt. 21, Exh. 1F.

a scholarship and never received all of the money back or a scholarship for the entire amount. Dkt. 17, Exh. 2H. Diakite signed the affidavit on August 26, 2008, which is before Ohia sent Dittmer the initial termination letter. *Id.* Additionally, the Faculty Senate Committee report, which Rudley received before he upheld the termination decision, clearly states that "Dittmer is guilty of violating the University's policy with regard to the award of student tuition waivers" and notes that Dittmer's actions were "possibly grounds for termination." Dkt. 21, Exh. 1H. Defendants' evidence clearly demonstrates that its officials had sufficient reason to believe that Dittmer had violated TSU policy by taking "donations" from students for scholarships and then not awarding scholarships or tuition waivers to the students in the same amount that was donated.[16] The court finds that this is a legitimate, nondiscriminatory reason for terminating Dittmer's employment.

Dittmer argues that Defendants' reason for the termination is pretext and that the real reason TSU terminated his employment was discriminatory. Dittmer offers several arguments as to why Defendants' reason for termination is pretext, but none of the reasons he offers "suggest that impermissible discrimination underlies [his] termination." *Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 372 (5th Cir. 1997). Dittmer's first argument is that TSU did not investigate other faculty members, even after the audit revealed that another faculty member in the Airway Science Department deposited a check into the scholarship fund. Dkt. 21. However, Defendants do not claim that Dittmer's employment was terminated because of the tuition-rebate practice. Thus, evidence that other professors may have engaged in the practice is not evidence of pretext.

---

[16] Dittmer argues that TSU has never indicated what policy he allegedly violated, but the Faculty Hearing Committee report, upon which Dittmer himself relies as evidence, indicates that the Faculty Hearing Committee believed Dittmer violated TSU policy. While presenting evidence of the exact policy violated may have been helpful, the Faculty Hearing Committee report is sufficient evidence that a policy, whether written or merely understood by TSU faculty as being the university's policy, was violated.

Dittmer also claims that Sylve's TSU DPS CID report is evidence of pretext because it indicates that Sylve concluded that Dittmer had solicited funds from TSU students in exchange for scholarships before even speaking to a witness. Dkt. 21. However, while Sylve does not appear to have personally spoken to a witness before reaching his preliminary conclusion, the report states that Sylve reviewed documents, including the student complaints, before reaching his preliminary conclusion and beginning the investigation. Dkt. 21, Exh. 1I ("After reviewing the documents submitted by various complainants and witnesses it is my professional opinion that . . . Dittmer committed fraud [and] it was further determined that . . . Dittmer solicited funds from [TSU] students in exchange for scholarships."). Moreover, the Internal Audit Department referred the case to Sylve for investigation, so Sylve was simply performing his duties as an investigator, which started with reviewing the student complaints and drawing preliminary conclusions. The preliminary conclusions are not evidence of pretext.

Dittmer also contends that Defendants' reasons for terminating his employment are pretextual because the police report of Detective Sonja Jackson exculpates him. Dkt. 21. Jackson's report, which is dated more than a month before Dittmer's termination, states that the Harris County District Attorney's office found no violation of the criminal laws. Dkt. 21, Exh. 1J. However, Defendants do not claim that Dittmer's employment was terminated because of a violation of criminal law, so the Harris County District Attorney's decision not to prosecute the case is irrelevant.

Dittmer points out that Ohia, in his affidavit, states that he believes the tuition-rebate practice is illegal, *see* Dkt. 17, Exh. 3, and Dittmer claims that Ohia's statement, in combination with Detective Jackson's report that the District Attorney did not believe that there was a violation of criminal law, is evidence of pretext because Ohia knew (or should have known) that Dittmer had not violated any criminal laws. The court is not persuaded by this argument. First, there is no evidence

that Ohia received Jackson's report.  Second, even if Ohia did receive the report, his affidavit does not indicate that his belief that the practice is illegal was the sole reason for Dittmer's termination. Ohia, in fact, states that he met with Dittmer prior to terminating Dittmer's employment to discuss the findings of the internal audit, and that Dittmer admitted to the tuition-rebate practice *and* "admitted that he did not know what happened to the additional money the two international students had paid."  Dkt. 17, Exh. 3.  Ohia goes on to state that after "this meeting, . . . I determined that [Dittmer's] termination was warranted."  *Id.*  This evidence supports Defendants' legitimate nondiscriminatory reason for termination.  Whether Dittmer was prosecuted for and convicted of a crime is irrelevant.  Thus, Ohia's belief that Dittmer's conduct is illegal, whether supported by the record or not, is not evidence of pretext.

Finally, Dittmer claims that Defendants' reason for terminating his employment is pretextual because Rudley upheld the termination even though the Faculty Hearing Committee recommended that Dittmer be reinstated.[17]  Dkt. 21.  However, the TSU Faculty Manual expressly states that the TSU president may approve, reject, or amend the Committee's findings.  Dkt. 21, Exh. 1F.  It then outlines procedures for the TSU president to follow after making his decision.  *Id.*  Dittmer contends that Rudley did not follow these procedures because he did not notify Dittmer of his reasons for not accepting the Committee's recommendation in writing.  Dkt. 21.  However, in the letter Rudley sent to Dittmer in which Rudley upheld the termination decision, Rudley specifically referenced, in writing, the Committee's finding that Dittmer was guilty of violating TSU policy, and Rudley indicated that he accepted that finding before noting that he was rejecting the recommendation that

---

[17] Dittmer claims that this was a "virtually unprecedented step," but he does not offer any evidence that rejecting a Faculty Hearing Committee recommendation is unprecedented.  *See* Dkt. 21 at 15.

27

Dittmer be reinstated.  Dkt. 21, Exh. 1E.  The letter is brief, but it is clear from the letter that Rudley believed that the policy violation was sufficient reason for termination and simply disagreed with the Committee's determination that termination was too severe a penalty for that violation.

The court is not tasked with determining whether Defendants' reasons for terminating Dittmer were erroneous.  *See Walton*, 119 F.3d at 372 ("We do not view the discrimination laws as vehicles for judicial second-guessing of business decisions.").  The court must determine whether the real reason for Dittmer's termination was discriminatory.  Dittmer does not present any evidence of actual discriminatory intent, and the issues that Dittmer raises in support of his pretext argument are not sufficient for a reasonable fact-finder to infer that the real reason for termination must be discriminatory.  As the Fifth Circuit has so aptly noted, "discrimination suits still require evidence of discrimination."[18]  *Rubinstein v. Adm'rs of Tulane Educ. Fund*, 218 F.3d 392, 400 (5th Cir. 2000).

Because Dittmer has not met his *prima facie* burden, and because, even if he had, he has not presented sufficient evidence that the reason Defendants provide for Dittmer's termination is pretextual, Dittmer's discrimination claims and Title VII claims are DISMISSED WITH PREJUDICE.[19]

---

[18]  Indeed, the only evidence Dittmer offers of a potential ulterior motive with respect to Rudley relates to the lawsuit Dittmer filed against the University of Houston and its faculty members while Rudley was the interim president of the University of Houston.  Dittmer claims that no action was taken relating to the student complaints until after Rudley became the president of TSU.  While this may lead to an inference of *personal* animus, it is not evidence of animus based on race or national origin.

[19]  Defendants also claim that Dittmer's discrimination claims that are based on national origin should be dismissed because he failed to exhaust administrative remedies.  Since the court finds that Dittmer has not successfully presented a *prima facie* case for any of his discrimination claims, it does not address this argument.

**C.      Due Process Claims**

Dittmer claims that Rudley and Glass violated his due process rights (section 1983) because he was deprived of his right to a pretermination hearing before the Faculty Hearing Committee and because they did not follow the other procedures relating to termination of a faculty member outlined in TSU's faculty manual.  Dkt. 21.  Rudley and Glass argue that Dittmer cannot show that he was deprived of due process because he must be able to demonstrate that he had a property interest in his continued employment with TSU and he cannot do so.  Dkt. 17.  Rudley and Glass further argue that, even if Dittmer had a property interest in his continued employment with TSU, he was only entitled to notice and a hearing, and he cannot show that Rudley or Glass were involved in the decision to terminate Dittmer's employment without notice and a hearing.  Dkt. 17.  Finally, Defendants argue that even if Dittmer had a property interest in his continued employment at TSU and Rudley and Glass were involved in the termination decision, Rudley and Glass were acting within their discretionary authority and are entitled to qualified immunity.  Dkt. 17.

**1.      Property Interest in Continued Employment**

Dittmer argues that he had a property interest in his continued employment at TSU because, while he did not have a written contract for the 2008/2009 academic year, he was under contract by operation of law, and such a contract creates a property right.  Dittmer states that he had an annual employment contract each year he worked at TSU through 2007, but that he did not receive a written contract in 2008.  Dkt. 21.  Under the Texas Education Code, TSU was required to either give Dittmer a written renewal contract not later than thirty days prior to the first day of the academic year or, if unable to comply, to provide him with written notification as to why it could not comply.  Tex. Educ. Code § 51.943(b).  According to Dittmer, he did not receive such a notification.  Dkt. 21.  Additionally, TSU did not offer Dittmer a written contract before the 61st day after the first day of

the academic year, and the Texas Education Code requires an institution that "does not offer a faculty member a written contract before the 61st day after the first day of the academic year" and yet "retains the faculty member," to "retain the faculty member for that academic year under terms and conditions . . . that are at least as favorable" to the faculty member as the contract for the preceding year. *Id.* § 51.943(e). Dittmer claims that, pursuant to these provisions of the Texas Education Code, he was working under an employment contract imposed by operation of law at the time his employment was terminated. Dkt. 21 at 10. Under TSU's policies, if Dittmer were under contract, he could only be dismissed "for cause," and he was entitled to a pretermination hearing unless he was convicted of a crime or admitted the facts justifying dismissal in writing. *See* Dkt. 21 & Exh. 1F. Defendants do not address these arguments in their reply. *See* Dkt. 22.

"State law can create a property interest in continued employment." *Page v. DeLaune*, 837 F.2d 233, 238 (5th Cir. 1988) (citing *Board of Regents v. Roth*, 408 U.S. 564, 576-78, 92 S. Ct. 2701 (1972)). The Supreme Court and the Fifth Circuit have both held that there was a property interest in continued employment in cases similar to this case. *Id.* at 239 (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S. Ct. 1487 (1985)) (other citation omitted) (stating that the "Supreme Court and this Court have held that" language in a state universities' regulations limiting dismissal only to cases of "adequate cause" "suffices to create a property right"). The court finds that Dittmer had a property interest in his continued employment and was thus entitled to due process.

### 2.    Due Process Requirements

"The Due Process Clause requires that a state, before depriving a citizen of property, provide 'some kind of a hearing.'" *Page*, 837 F.2d at 239 (quoting *Loudermill*, 470 U.S. at 542). The

"pretermination 'hearing,' though necessary, need not be elaborate." *Loudermill*, 470 U.S. at 545.

"The essential requirements of due process . . . are notice and an opportunity to respond." *Id.* at 546.

Defendants do not argue that Dittmer had notice and an opportunity to respond before he received the termination letter from Ohia. Instead, they claim that Dittmer has failed to present any evidence that Rudley and Glass were involved in the initial decision to terminate Dittmer's employment prior to a hearing. *See id.* Defendants claim that Rudley, who is the president of TSU, upheld the decision to terminate Dittmer's employment but that there is no evidence that Rudley was involved in the initial decision. *Id.* And Defendants argue that Glass, who is an associate professor at TSU, did not even have a position that would allow him the power to make a termination decision. *Id.*

"In order to state a cause of action under § 1983, [a plaintiff] must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged." *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999). "It is not enough to allege that government officials with no direct contact with a plaintiff are responsible for acts of their subordinates." *Id.* For example, in *Page v. DeLaune*, the Fifth Circuit affirmed the district court's dismissal of a university president and regents because the plaintiff had "pointed to no evidence in the record linking the president or regents of the University to the denial of pretermination due process." *Page*, 837 F.2d at 240. In this case, the only people Dittmer's evidence links to the initial termination decision are Sunny Ohia, Brian K. Dickens, and John Sapp—individuals who are not named as defendants in this case. Dittmer's termination letter is from Ohia, and Dickens (the executive director of human resources) and Sapp (the interim dean) are copied. *See* Dkt. 21, Exh. 1D. Ohia's affidavit indicates that, prior to the termination, he determined termination was warranted, submitted the request to the executive director of human

resources (Dickens), and mailed the letter of termination to Dittmer after receiving approval from human resources.  Dkt. 17, Exh. 3.  The uncontroverted evidence therefore establishes that Rudley and Glass were not involved in the decision to terminate Dittmer's employment prior to a pretermination hearing.  Thus, they were not involved in any violation of due process that may have occurred.

In addition to his claim that he was deprived of a pretermination hearing, Dittmer appears to argue that Rudley and Glass violated his due process rights by completely ignoring the due process procedures mandated in its own written policies.  Dkt. 21 at 16.  Specifically, he argues that he received only a "perfunctory appeal hearing" after his termination and that, while he was entitled to such a hearing within thirty days of his request, "no hearing was had until several months later." *Id.*  Additionally, he argues that he was entitled to a written statement of the university president's reasons for rejecting the recommendation of the Faculty Hearing Committee, and that the president "provided no explanation whatsoever."  *Id.*  Defendants argue that all that the Due Process Clause requires is notice and an opportunity to be heard and that Dittmer's claims with regard to TSU's other policies do not rise to Constitutional violations.

As the Fifth Circuit has noted, there "is not a violation of due process every time a university or government entity violates its own rules.  Such action may constitute a breach of contract or violation of state law, but unless the conduct trespasses on federal constitutional safeguards, there is no constitutional deprivation." *Levitt v. Univ. of Tex. at El Paso*, 759 F.2d 1224, 1230 (5th Cir.), *cert. denied sub nom. Levitt v. Monroe*, 474 U.S. 1034, 106 S. Ct. 599 (1985).  Here, there was a delay of several months between Dittmer's request for a hearing and the hearing, but Dittmer has not shown that the delay can be attributed to the actions of either Rudley or Glass and, even if he had, such a delay does not infringe upon constitutional safeguards.  The alleged lack of a written reason

for Dittmer's termination from Rudley also does not infringe upon constitutional safeguards.  Rudley sent Dittmer a letter indicating that he accepted the Faculty Hearing Committee's findings relating to Dittmer's violation of TSU policy and that he rejected the Faculty Hearing Committee's recommendation of reinstatement in a timely manner following the hearing.  Dkt. 21, Exh. 1E.  The lack of specific reasons does not violate the "essential requirement of due process."

Because Dittmer has not shown that Rudley and Glass were involved in the decision to terminate his employment without a notice and a hearing and because any violations of TSU policies with regard to termination procedures that Dittmer has shown involved Rudley and Glass do not rise to constitutional violations, Dittmer's claims against Rudley and Glass, in their individual capacities, under 42 U.S.C. § 1983 for violations of his right to due process of the law, are DISMISSED WITH PREJUDICE.

## IV. Conclusion

Dittmer's motion to strike (Dkt. 20) is **GRANTED IN PART AND DENIED IN PART**.  Defendants' motion for summary judgment (Dkt. 17) is **GRANTED**.  Dittmer's remaining claims are **DISMISSED WITH PREJUDICE**.

It is so ORDERED.

Signed at Houston, Texas on June 2, 2011.

Gray H. Miller
United States District Judge